And we'll move on to the second case of the day, Ruiz-Cortez v. Lewellen, and we'll hear first from Mr. Smith, and that is case number 18-1078. Thank you, your honors. May it please the court, Christopher Smith on behalf of Mr. Ruiz-Cortez. Mr. Ruiz-Cortez spent a decade in jail away from his family before the United States government charged Officer Lewellen with obstruction of justice. The obstruction of justice was based on the fact that their charge indicated Lewellen prosecuted Ruiz in order to protect his own drug dealing syndicate. Officer Lewellen was convicted of conspiracy to distribute cocaine with his long-term informant Rodriguez, and the United States used the Lewellen perjury in the Ruiz case in aggravation at sentencing. Yet in our civil case, Officer Lewellen was allowed to hide behind the Fifth Amendment while claiming that his invocation of the Fifth Amendment had nothing to do with the Ruiz case. Mr. Smith, you proposed an instruction at some point to the court that the court instruct the jury that you could only assert the Fifth Amendment if you have a reasonable belief that an honest answer might subject you to criminal prosecution. There's a reference to the judge rejecting that, but I couldn't find in the appendix or in the record where specifically the judge did that. Was he relying on his prior motion in Limine ruling, or was there a separate jury instruction conference that didn't make it into the record? There was a separate jury instruction conference where everything was expressed off the record, but we did make an objection on the record, and the record is essentially in the motions in Limine, in our summary judgment motion on how to treat the Fifth, and in our instruction and our belief that you can't just say that we can take the Fifth because it's adverse to us. Were the court's ruling rejecting your proposal that was done off the record, was the reasoning for that the reason he gave in ruling on the motion in Limine, or can we tell from the record? We can tell from the record at every stage. He misapplied the Fifth Amendment in his summary judgment finding, in his motions in Limine finding where he said that Llewellyn could explain away his taking of the Fifth, in his concept of how he was allowed to get away with saying what he said in invoking his attorney into the Fifth, and even allowing the attorney to explain away the Fifth. In every step, and including the final step of having an instruction which misstated the law versus an obstruction that at least would have stated the law correct. What case do you think holds that he misstated the law in the instruction that was given? Well, in the first place, the definition of the Fifth Amendment and the right to self-incriminate ties back to the fact that the honest answers must be given, and there is case law saying that it must be tied back to honest answers. Could you be more specific? LaSalle National Bank gives a really good breakdown of the Fifth Amendment. And LaSalle National Bank talks about how we can know that the seriousness of the Fifth can lead to even summary judgment, because you are saying my honest answers would incriminate me on key facts that relate to both the civil case and the... Well, in terms of the... I guess, Your Honor, if I may, the cases in high fructose corn syrup was explained that it had to be honest answers that would lead to criminal liability. That's an opinion that explains the application of the Fifth Amendment, right? Correct. So, when you're talking about how to instruct a trial jury about how to deal with a party's invocation of the Fifth Amendment, are there cases... is there a case that indicates that Judge Linen-Weber's instruction was an error? I would only suggest that you can't fail to properly give the actual meaning of something, and we have to look at what the meaning of the Fifth Amendment is. But Counsel Llewellyn was in a lot of hot water. I mean, his liability, his criminal liability, extended beyond just what he had done in this case that involved the Reeds-Cortez. So, invoking the Fifth Amendment didn't necessarily... I mean, there were reasons for him to invoke the Fifth Amendment that extended beyond the incriminating statements that affected your client. Well, they certainly were a part of the overall scheme where our case involved an informant and the officer who were convicted of conspiracy together. And our case was long after the beginnings of that relationship that led to this conspiracy, and it was inclusive of our case in it, and it was specifically indicted. And you have to have a reason to not answer each specific question. You can't say this is intending to incriminate me because of something completely else. There has to be an honest belief that the questions that you're answering are ones that would lead to the possibility of incrimination. Counsel, did you have an obligation when Judge Lennon Weber asked you, do you want to state your objection for the record? Your conference about the jury instructions had been off the record. And then he gave you an opportunity to state it on the record, and you recorded your objection, but you didn't repeat your reasons for it on the record. Does that mean that we're now reviewing it for plain error? No, we believe that the providing of the instruction and our prior records on the Fifth Amendment from the beginning to the end stated it in a much more complete fashion than anything else. I will just go ahead and say for the record that the practice of having the substantive discussion about jury instructions off the record and then trying to make a quick, clean record of objections and rulings on them is very dangerous for everybody. In your case, maybe you wound up with the short end of the stick, Mr. Smith, but you're entitled to have those discussions on the record so that the full discussion is available to a reviewing court. We would hope so, too. But you'd have to ask for it. That's the judge's practice, and you have a right to have a record, but you have to ask for it. Yes, sir. It turns out, though, that Mr. Rodriguez's tip about your client was, in fact, accurate, right? Well, first of all, we don't know the specifics of what those conversations were. That there was cocaine at his house? Mr. Rodriguez has admitted that he kept cocaine at his house, but this case and the due process claim was about a charge where the evidence, the central evidence, was that he had cocaine in the parking lot, dropped it, and a police officer recovered it. I think we understand, but I guess my problem is we're looking at a defense verdict from the jury trial. Is the possibility that the jury decided that both Ruiz and Llewellyn were crooks and a pox on both your houses, no money for anybody? Well, in reality, though, that's even the more reason why the instructions needed to be correct, while the law had to be applied correctly. Was that an unreasonable view of the case, given how many kilograms of cocaine were found? It was 10 kilograms that were inventory. We understand some may have gone in another direction, but at least 10 kilograms. Was that an unreasonable view for the jury to take in this case? It was unreasonable to view that it was not a Brady violation, and unreasonable to view that it wasn't material to whether they would have gone forward on a case against Mr. Ruiz. Are you abandoning your fabricated evidence theory, then, under due process and just relying on the Brady? No, we're not abandoning that. Clearly, Llewellyn did fabricate evidence. And if you would have applied the Fifth Amendment standard correctly, it would have been clear. However, when you're asking for a judgment as a matter of law, the Brady issues are more clear, because much of that evidence was not even in dispute in any form. That would have tended to show that Llewellyn and Rod Ruiz had a bias towards each other, and a bias towards protecting even that golden goose of an informant. But how do you get around, on the JNOV motion, how do you get around that the timing of that criminal relationship was not clearly established, or not something that the jury had to accept in light of the stipulation? Well, the only timing issue was whether they were selling drugs actively together a certain time. But the timing of the conspiratorial relationship was throughout, from day one to day 2,000. I know there was testimony about it. Mr. Rodriguez testified about it. But why did the jury have to accept that, in light of the stipulation about the verdict in the criminal case, that the jury reached a hung verdict on whether or not Llewellyn had obstructed the prosecution of your client? Well, there was no contradictory evidence. I mean, Llewellyn essentially is lying on a theory that his co-conspirators were criminals, so therefore they shouldn't be believed. When in reality, though, he knew from day one that they were criminals, and throughout this process. And those are a basis for Brady in and of itself, in that he was in a position where he had a desire to lie to protect his golden goose informant, even if he didn't join in the drug selling itself, even if he didn't join in the extortion and framing. But counsel, the jury heard all that evidence and rejected your argument. And I don't see how the conviction, for the reasons that Judge St. Eve is suggesting, how the conviction establishes otherwise such that your client was entitled to a judgment as a matter of law. Well, the jury not only was misinformed in the Fifth Amendment. In this case, the defense counsels and the defense was allowed to not even acknowledge undisputed facts through this use of the Fifth Amendment and throughout the case. I mean, this was turning into an identity case. This was turning into a, you know, I thought you argued that the Brady violation was necessarily established by his conspiracy conviction. Is that not your argument? That was the judge's argument when he first granted the JNOV. He relied solely on that fact and said, there are no other undisputed facts. We have always said that there were undisputed facts, uncontradicted facts, in addition to the conviction that require the finding as a matter of law. And what were those undisputed facts that the conspiratorial relationship between your client and Llewellyn was ongoing at the time of his conviction? Well, it starts with the fact that Llewellyn knew he was a criminal when he made the deal. He comes in with 65 reports of major busts where we know he's in the middle of all the drug activity. He knows that he's under investigation for a drug case from the FBI. Is there evidence that was admitted at trial that Llewellyn, who was a police officer at the time, knew that he was under FBI investigation when they got the cocaine from your client's house? Yes, before. The evidence came through a DEA agent who testified that Llewellyn was the one who called him to get him out of the hot waters. Wasn't that several years earlier? It was years before, Mr. Ruiz. I think it was 1997 versus 1999. But how does that establish that Llewellyn knew he was under investigation at that time? How can you ask to have him not be investigated any further if you didn't know that he was under investigation? I thought you were arguing that Llewellyn knew Llewellyn was under investigation. Oh, no, I'm sorry. Okay, I misunderstood you then. No, Llewellyn did not know he was under investigation. I don't think he established it. I do want to talk about the fact that the city also was able to avoid having to explain how they partnered, bankrolled, and protected somebody they worked with on 65 occasions who was actively involved in heading a drug syndicate while murdering people and kidnapping people. What was the evidence that you submitted of a widespread custom of this? I understand your argument individualized as to Mr. Rodriguez, but what was the evidence that you submitted to the district court establishing a widespread custom at the city? Well, first of all, there were 65 uses, and they were the biggest busts in the City of Chicago Police Department for the most part. I understand that, but was there anything besides the 65 uses with respect to Rodriguez that you were relying on? Well, and also the fact that the narcotics was based on scandal after scandal after scandal. The city knew, including the mayor and on up, that they were supposed to supervise narcotics, and they weren't supervising narcotics in this instance. In fact, Hilliard, who was the acting head of the CPD at that time, actually said, oh, I didn't care, I let narcotics handle that. I mean, so you have two prongs of where the main players in the Chicago Police Department were directly involved. Over and over and over again, commanders had to approve the over $800,000 in payments to Rodriguez. But you're coming back again to Rodriguez. Your theory is that there was a widespread failure to supervise informants and handlers. And my question to you is, what is your evidence that that was the moving force behind the injury here? The moving force behind it? Or that, I guess, even taking a step back, other than Rodriguez, what was your evidence that you provided to the district court that there was such a custom beyond Rodriguez? Well, we did not provide another confidential informant's history and what was done and used in that sense. But this was half of what the narcotics section was doing at the time. There weren't any informants on this level. There weren't thousands of confidential informant uses. This was their center of the narcotics unit at that time. The pattern could be established from this person. In addition, the pattern could be established from the lack of overall supervision that they allowed a narcotics officer and his informant, who was the most dangerous situation to run around completely unsupervised and trusted that they wouldn't do anything wrong. And they had a system where they just basically generated papers and put them in a safe and essentially hid so nobody would even know to think, oh, we're working with criminals. And that's exactly what they were doing here. And in terms of the moving force, you look at the results. When you work with a criminal and they're active, crimes are civil rights violations. Also, the byproduct of crimes are Brady violations. You have to lie for your informant, if you know, and you have to hide their criminal actions. And if you're working with them and part of their drug dealers, of course police officers aren't going to come forward and admit that they're committing crimes with their informant. So it was a direct byproduct of allowing these two individuals to become monsters and essentially commit crimes. And as this 1997 report was important to your argument on the customer policy. Absolutely. Every scandal was about narcotics agents. And the report specifically said, hey, this is the exact situation we need you to pay extra attention to. Set up every system in place to make sure you're watching these narcotics guys because they're out there with these billions and billions of dollars. And that is a lure. And to have him running around working in a drug organization and not even caring, where's the information coming from? How is this guy getting 65 of the biggest busts? What is he doing? How does he know this? Who is he connected to? Those are all things that the city just went, I don't want to know because they knew. They knew. This was worse than if they had actually said, let's partner with Rodriguez, let's let him do murders, let's protect him. Was there anything in the 1997 report about Brady violations resulting from that conduct? Well, I don't know how you separate crime by police officers with Brady violations because the two absolutely go hand-in-hand. But was there anything specific? Not specific. I see my time is coming down, so I would like to reserve some rebuttal. Thank you very much, Mr. Smith. Thank you. We'll hear from the defense, Ms. McLaughlin. May it please the Court. Mr. Ruiz-Cortez was convicted of possession with intent to distribute cocaine after cocaine and cash were found at his home. During his civil trial in this case, he admitted that he had the cocaine and he also admitted that he perjured himself during his criminal trial. Even so, he claims he would have been acquitted had he been able to impeach Defendant Former Officer Glenn Llewellyn, who testified against him at the trial. The jury rejected that claim and the district court correctly preserved the jury's verdict. The jury could have reasonably concluded that there was no Brady violation because Llewellyn did not fail to disclose impeachment evidence that would have affected the outcome of Mr. Ruiz-Cortez's trial. You agree he failed to disclose impeaching evidence? I'm sorry, Your Honor. Do you agree that Mr. Llewellyn failed to disclose impeaching evidence at the time of Mr. Ruiz-Cortez's prosecution? Is the question whether I agree that he did fail to disclose impeachment evidence? Yes. No, I don't agree with that. Why do you not agree with that? Based on the record at the trial, the jury could conclude that there was no undisclosed impeachment evidence, and that is because the only evidence, as this Court, I think, already noted, that was introduced at trial that the jury was required to believe was... You don't think it would have been an interesting impeachment of then-Officer Llewellyn, that he'd been engaged in this long-term drug conspiracy with Mr. Rodriguez at the time of Plaintiff's criminal trial? But the evidence, Your Honor, that was introduced during the civil trial did not establish that that conspiracy was ongoing at the time of the 1999 criminal trial. Do you agree that if Llewellyn and Rodriguez were in a criminal relationship or had been in a criminal relationship in 1999 at the time that the cocaine was taken from the Plaintiff's home, that that was Brady and should have been turned over? That would have been impeaching, Your Honor, but... It was not a Brady violation because Brady also has that element of materiality. Do you agree that it should have been turned over at a minimum under Giglio as an impeachment? It was impeaching. Okay. And is the defense theory here that Llewellyn and Rodriguez were involved in a conspiracy for a while, took a break from it while Mr. Ruiz-Cortez was being investigated and prosecuted, and then went back to it? No. You think nothing criminal happened between Llewellyn and Rodriguez until after Ruiz-Cortez was convicted? That's the theory? The evidence in this record does not establish that anything criminal happened prior to 1999 that the jury was required to believe. Now, the jury could have believed based on, for example, the testimony that Rodriguez presented at Llewellyn's criminal trial that was read into the record. Based on that evidence, this civil jury could have drawn the inference that there was a conspiracy happening, and they apparently did not do that, and they were not required to. On a Rule 50 motion, of course, the court has to construe the evidence strictly in favor of the verdict and must disregard any evidence that's favorable to Mr. Ruiz-Cortez that the jury was not required to believe. And the conviction didn't require the jury to accept that because the conviction didn't necessarily mean that the criminal jury thought that the conspiracy had begun in 1996. That is correct. The conviction itself is not based on findings of any particular acts that Llewellyn may or may not have committed in furtherance of the conspiracy. So that conviction did not establish as a matter of law that the conspiracy was happening in 1999. What about under the new trial standard, under Rule 59, where it's a different standard than Rule 50? Correct, it's an abusive discretion standard. But the district court applies a different standard. It's a manifest weight of the evidence standard. Given all of the testimony about the criminal relationship, how do you get around that standard? So the district court was not required to conclude that, given the entirety of the record at trial, that it was an unfair result to Mr. Ruiz-Cortez that the jury did not find a Brady violation. And it really, I think, comes down to the same reasons why the jury simply wasn't – a reasonable jury could have found otherwise. So we don't distinguish between the result of the Rule 50 motion and that piece of the Rule 59 motion. A reasonable jury could have concluded both that evidence was not undisclosed but also that even had that evidence been made available at the time, that it didn't rise to the materiality threshold for Brady because Mr. Ruiz-Cortez, who was guilty, would have been convicted anyway. And because of the weight of the evidence at the criminal trial against Mr. Ruiz-Cortez, that was a reasonable conclusion for the jury to draw, no matter how many times you impeach Llewellyn and no matter how bad a guy as Saul Rodriguez was. The fact remained that Mr. Ruiz-Cortez had as much as 200 pounds of cocaine in the closet of his house, and the civil jury heard that. They heard also that federal agents and police officers discovered $1,800 hidden in a vacuum cleaner, and that was crisp new $100 bills. They also heard that Mr. Ruiz-Cortez's home had been under surveillance for weeks before his arrest, and other people had been arrested for retrieving drugs at that location. Others saw the cocaine in the cache besides Officer Llewellyn. Mr. Ruiz-Cortez made an incriminating statement to police after his arrest, and, in fact, ultimately he has admitted that he was guilty. And another piece of the Brady argument that Mr. Ruiz-Cortez fails to establish is, how exactly, given all of that evidence, could he have stood before a criminal jury and convinced them to find him innocent? He doesn't even explain how he would have accomplished that. But a lot of that evidence came out after the fact in the pleadings and the defendant's own admissions. At the criminal trial, really the only witness was Llewellyn. Llewellyn was an important witness at the criminal trial. He was the important witness at the criminal trial, wasn't he? He was, but... So a lot of the evidence you've just summarized is information that came out after the fact, at the civil trial, through the plaintiff's pleadings, through the plaintiff's own testimony. Plaintiff at the criminal trial didn't have to testify. A lot of that evidence may never have been before the jury. So the focus is on what did the criminal jury know, and the witness against the plaintiff was Llewellyn, who was convicted subsequently of this conspiracy. Your Honor, Mr. Ruiz-Cortez's position is, had I known that there was impeachment evidence available against Officer Llewellyn, I would have played that whole criminal trial differently. He doesn't tell us how, but he suggests that maybe I would have kept quiet. Maybe I wouldn't have made the defense that I did. Well, if you have one main witness who is a dirty cop who testifies against you, and you don't know the fact that he's a dirty cop, and he's been conspiring with the person who put the drugs there, I don't think it would be an unreasonable inference to draw how he could have used that evidence differently. Exactly. But if the prosecution has one key eyewitness who is a dirty cop, and they know that, then there's other evidence that they might have put on to corroborate his testimony. Or not have brought it at all. They might not have brought it at all, and that certainly is an argument that Mr. Ruiz-Cortez makes. And, in fact, that's his only argument. The prosecution wouldn't even have brought this case. Isn't there some support for that, in light of what the prosecutor said to the district court when they came in to dismiss the criminal case against Mr. Ruiz-Cortez? Yes. The district court that held the criminal case. Yeah. There is support for that. A prosecutor may not want to bring the case where there's a dirty cop involved. And I think that's fair to say. That is not the same thing as Brady, however, because that is simply an exercise of prosecutorial discretion, which is not the same thing as the Brady standard. That what Mr. Ruiz-Cortez has to prove is that he would have been able to persuade that criminal jury of his innocence, and he hasn't explained to the district court or to this court how exactly he would have done that. He hasn't explained whether he would have persisted with the same perjury that he committed at the time of the criminal trial, whether he would have invented a different lawyer, or whether he would have just kept quiet. And without some understanding of why he would have been acquitted, he can't meet the threshold for materiality under Brady. I want to turn to the Fifth Amendment, please. Do you agree under the Fifth Amendment law that the only reason a person can assert their Fifth Amendment rights is if a truthful answer to the question might tend to incriminate that individual? No, that's not what the Fifth Amendment case law holds. There are other reasons why a person could assert Fifth Amendment rights. For example, in Lewallen's case, this is just speculation, but if he believed that there might be inconsistencies in his testimony or there might be some danger of that, he might want to avoid that, knowing that he could be subject. What law says, again, to assert the Fifth Amendment, I'm not talking about the Adverse Inference Jury Instruction, I'll get to that in a minute. What law lets a person assert the Fifth Amendment and refuse to answer merely on the basis that there might be inconsistent statements, not taking it to the next step that those inconsistent statements might tend to incriminate him? Your Honor, I don't have a case that says exactly that. I don't think you'll find one. Evans does say that the Fifth Amendment is not simply an admission of guilt and recognizes that even those who deny wrongdoing may have a basis for invoking the Fifth Amendment. Nevertheless, no case says what you're saying, right? That is a hypothetical about what other basis for invoking the Fifth might be possible. I think it might come as a shock to law enforcement authorities in Chicago if they were told that somebody can take the Fifth simply because they're afraid they might be caught in inconsistent statements. And what Evans says is that somebody might think they're innocent but nonetheless assert the Fifth because they realize that a truthful answer to a question might tend to incriminate them. That's very different than saying that you can assert your Fifth Amendment for some basis other than believing that a truthful answer might tend to incriminate you. So in light of... Take my statement that you can only assert the Fifth Amendment if a truthful answer might tend to incriminate you. When Llewellyn was asked questions, he made the statement, I'm asserting the Fifth Amendment on the basis of my criminal attorney because my criminal case is under appeal. And then he went on to say, I would love to testify here. At which point there was an objection. The judge sustained it but did not strike that. So the testimony remained in the record that he was asserting his Fifth on the advice of counsel because he had a criminal appeal pending but he would love to testify. And then the court does not instruct the jury that the only reason you can assert your Fifth Amendment right is if you believe that a truthful answer might tend to incriminate you. Why wasn't that wrong? And why couldn't that have led the jury here not to give an adverse inference because they thought there was some other reason you could assert the Fifth Amendment? Your Honor, I'm not going to say that it is correct that he can say I'd love to testify. What I will say is that that comment did not affect the outcome of the trial and that it wasn't an abuse of discretion for the district court to conclude that that did not warrant granting a Rule 59 motion. How do we know that based on the jury instruction? Because the jury instruction said, you have heard testimony in this case from persons asserting their Fifth Amendment. You may but are not required to infer from the witness's assertion of their Fifth Amendment privilege that the witness's testimony in response to those questions would have been adverse to them. But the jury could have believed he didn't want to testify or didn't want to say anything, even though he would have loved to have, because of his criminal appeal, not because he thought it might tend to incriminate him. First of all, the instruction to the jury was an instruction that has been approved by this court in other cases. For example, in Evans, it's a similar instruction to what this court approved there and held that it was not an abuse of discretion. I know you're talking about the specifics of this case. I'm talking about the specifics of this case, given the testimony that came in. Maybe the instruction on its own is fine, but I'm talking about if you combine that instruction with the statement of Llewellyn, who this case is all about, saying, I'd love to testify, but I'm not doing it because of my criminal appeal. Why isn't that problematic on this record? I think when we put it in context, it doesn't rise to the kind of statement that would have affected the outcome of this trial. And that context is, first of all, Llewellyn is testifying by video from prison. He's wearing a jumpsuit. And they know he's been convicted. There's a stipulation on that. But he's also asserting he's got an appeal going, suggesting he thinks he's going to win. Otherwise, he'd love to testify. Right. They've also just heard from Saul Rodriguez, who's detailed what he and Llewellyn allegedly were doing over the years. And furthermore, the comment was brief. And it drew an immediate objection. It really is five words. Five significant, powerful words. It wasn't struck from the record. That's my concern. The judge did not tell the jury, disregard that. But the jury was instructed. It could infer that the answers would have been incriminating. And just based on the whole scenario, it was not a situation where the jury is going to look at this guy. They were not instructed that they can infer that the answers would be incriminating. They were instructed that they could infer that the answers would have been adverse to them, not incriminating. That's true. Ms. McLaughlin? Yes. I'm sorry. Were you done? Yeah, I'm done. I wanted to shift gears a little bit. At pages 25 and 26 of your brief, you seem to imply that the jury could have concluded that Llewellyn had told federal prosecutors that he was a dirty cop at the time of Ruiz-Cortez's trial. Do you have any evidence to support that implication? I'm sorry. I'm trying to find it. Bottom of 25, top of 26. It would have been reasonable for the jury to infer that the prosecution had the information about Llewellyn's corruption. Do you have any evidence to support that charge? There's no evidence either way. Did you raise this issue in the district court in any way so that anybody would have thought there was a need to put on any evidence to call a prosecutor and say, Did Llewellyn tell you that he was in a corrupt conspiracy with Rodriguez at the time? It's an astonishing argument to see in this brief. Your Honor, I can't tell you whether this is in response to a new argument that was presented in the plaintiff's brief. Was it raised in the district court? I don't know. I can't tell you one way or the other. Were you involved in the district court? And you're making this charge in an appellate brief without knowing whether there's any basis for it? No. On review of the record, this is simply not evidence that was in the record. Have you mentioned this to the United States Attorney for the Northern District of Illinois? No. You think they might be interested to know that you suspect that their prosecutors knew they had a dirty cop involved in the trial without there being any evidence to support that? Your Honor, let me clarify, though. I believe that this information was simply the identity of the informant, not whether Llewellyn himself was involved in the conspiracy. Ruiz-Cortez had the burden to establish that the evidence was suppressed from federal prosecutors. That's what your brief said. We're talking about all of the Brady evidence about Llewellyn's corruption and his involvement with Rodriguez. Your Honor, just to clarify, in this particular part of the brief we're not talking about Llewellyn's conspiracy, the alleged conspiracy at the time. We're talking about whether the federal prosecutors would have known who the informant was. I'm sorry, what did you say? Whether federal prosecutors would have known? Would have known the identity of the informant. This is also about knowledge about Llewellyn's criminal activity, bottom of the 25. In a Brady argument. This is in specific reference to Ruiz-Cortez's argument that Rodriguez was the one who provided the tip and that he was paid a lot of money in other cases for providing tips. And you're also talking about what Ruiz-Cortez's criminal defense lawyer knew about Llewellyn's alleged criminal activity. Not in this section of the brief. I'm reading from the bottom line of page 25. That's the sentence immediately preceding your assertion that Ruiz-Cortez had the burden to establish that the evidence was suppressed from federal prosecutors. What else? Yeah, Your Honor, to the extent that this could be read as referring to the fact that Llewellyn was allegedly involved in a criminal conspiracy at that time, that's not what this part of the brief is intended to refer to. Really? This is talking about the argument raised in Plaintiff's Brief that even if we put aside whether or not the evidence established that Llewellyn was involved in a conspiracy, it was sufficiently impeaching Brady material in itself that Rodriguez provided the tip and that Rodriguez had provided tips in 65 other cases and gotten paid a lot of money for doing so. And that Llewellyn's alleged criminal activity. That's the last sentence of that paragraph. You want me to read it to you? Likewise, while Levinson testified that had he known about Llewellyn's alleged criminal activity, he would have cross-examined Llewellyn about it. He provided no evidence regarding what prosecutors knew about Rodriguez. Right, and that's the key point. We're talking about what evidence did prosecutors know about Llewellyn. So you're not accusing the federal prosecutors of having known about Llewellyn's corruption? No. Good. Anything further? No, I see my time is up, so unless there are further questions. Thank you. Rebuttal, Mr. Smith? Just briefly. You know, the words I would love to testify are extremely powerful, especially in this setting where that was the center of their defense and where we were only allowed to ask five questions and cross. It was a very odd scenario altogether of Llewellyn. In addition to that, you hear even in this argument that essentially their defense was jury nullification. They're changing Brady from being about whether there was a fair trial to whether our client never committed a crime, our client didn't commit a crime. It's about whether our client had the right to rely on them not being able to prove a crime. Also, it's not about 15 years later, can you prove that your story is true? It's about proving that they withheld evidence, and that was against the manifest way to the evidence. And all this subterfuge, including even bringing in the city and showing that this was a good thing, the city should have been involved to see the big picture. The big picture and clear law would have made this a situation where there should have been a finding as a matter of law and the jury would have also come to that conclusion as well. Thank you all. Thank you, counsel. Thanks to both counsel. The case is taken under advisement.